IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| MARY CURTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09-5008-CV-SW-GAF |
| | ) | |
| FARMERS INSURANCE COMPANY, | ) | |
| INC. and FARMERS INSURANCE | ) | |
| EXCHANGE, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER, FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 29 and 30, 2010, this matter came before the Court for trial. Plaintiff appeared in person and through her attorneys, Donald Cupps and Todd Johnson. Defendants Farmers Insurance Company, Inc. and Farmers Insurance Exchange also appeared by their representative, Patricia Jacobs, and by and through their attorneys, Christopher Carpenter and Michael Moss.

Evidence was heard and the case was taken under advisement. Having fully considered all matters presented, it is found as follows:

## GENERAL BACKGROUND

1. Plaintiff Mary Curtin is an individual who resides in Missouri.

2. Defendant Farmers Insurance Company, Inc. is a foreign insurance company authorized to conduct business in the state of Missouri and authorized to issue automobile insurance policies in the state of Missouri.

3. Defendant Farmers Insurance Exchange is an insurance exchange authorized to do business in the state of Missouri.

4. On September 16, 2002, Mary Curtin was a passenger in a 2002 Mercury Mountaineer being driven by her husband, Lehman Dillon, a vehicle covered by policy number 140133974213.

5. While Mary Curtin was a passenger on that date, the vehicle was involved in a collision with a vehicle being driven by Jacob Geischen.

6. Jacob Geischen's vehicle was insured by Progressive Insurance and had liability insurance policy limits of $100,000 per person.

7. On August 6, 2007, Progressive Insurance, on behalf of Jacob Geischen, paid its policy limit of $100,000 to Mary Curtin for the personal injuries Mary Curtin alleges to have sustained in the collision.

## THE FARMERS POLICIES

8. Farmers Insurance Company, Inc. issued to the Plaintiff, Mary Curtin, and her deceased husband, Lehman Dillon, a policy of insurance, specifically policy number 140133974213 ("primary auto policy").

9. Under the primary auto policy, Farmers Insurance Company, Inc. agreed to pay all sums that she is legally entitled to recover as damages from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by her up to $250,000, subject to the terms and conditions of the policy.

10. Under the primary auto policy, there is a $250,000 limit of coverage available for payment of any covered damages that Mary Curtin sustained as a result of the negligence of Jacob Geischen in said collision that is in excess of the $100,000 paid by Progressive on behalf of Mr. Geischen.

11. Farmers Insurance Exchange issued to Mary P. Curtin and her late husband an umbrella policy of insurance, policy number 045920445 ("umbrella policy").

12. Under the umbrella policy, there is a remaining $175,000 limit of coverage available for payment of any covered damages Mary Curtin sustained as a result of the negligence of Jacob Geischen in said collision that is in excess of the $100,000 paid by Progressive on behalf of Mr. Geischen, and that is in excess of the $250,000 limit of the primary auto policy.

13. Mary Curtin has previously settled her underinsured claim for the wrongful death of Lehman Dillon under both the primary auto policy and the umbrella policy.

## THE ACCIDENT

14. The accident between the Gieschen vehicle and the Plaintiff's vehicle occurred sometime between 7:30 a.m. and 7:45 a.m. on September 16, 2002, at the intersection of U.S. Highway 52 and Highway 135 in Morgan County, Missouri.

15. Witness Mark Gross is a fact witness who witnessed the accident between the Gieschen vehicle and the Plaintiff's vehicle on September 16, 2002.

16. Mr. Gross immediately responded to the Plaintiff's vehicle and noticed that Plaintiff was conscious because she spoke to him and interacted with him.

17. Mr. Gross arrived at the Plaintiff's vehicle in less than thirty seconds after the accident occurred.

18. After interacting with the Plaintiff, Mr. Gross checked on the driver of the other vehicle, Mr. Geischen, who appeared to not be injured, and he returned to the

Plaintiff's vehicle and again began talking to the Plaintiff. The Plaintiff was still conscious when Mr. Gross returned to her vehicle.

19. The Plaintiff was talking to Mr. Gross and asking him for help.

20. It did not appear to Mr. Gross at any time after the accident that Plaintiff was unconscious.

21. Plaintiff never indicated to Mr. Gross that she was injured in any way.

22. Mr. Gieschen also went to the Plaintiff's vehicle immediately after the accident and was talking to the Plaintiff. The Plaintiff was asking Mr. Gieschen to please help her husband and Plaintiff also indicated to Mr. Gieschen that she was not seriously injured.

23. Plaintiff was wearing a seatbelt at the time of the accident.

24. Plaintiff has no memory from the time they initially collided with the Gieschen vehicle, until after the accident when she heard emergency personnel calling for the Jaws of Life to extricate her from the wrecked vehicle. The emergency personnel then removed the windshield, extricated Plaintiff from the vehicle, put a collar on her neck, and placed her on a stretcher.

25. Plaintiff's first memory after the accident was seeing a person she considered to be a firefighter or paramedic dressed in yellow, who was calling for the Jaws of Life. Her husband's hand then hit her face, and a large quantity of blood began flowing down her husband's arm onto Plaintiff. Plaintiff then began yelling for help.

26. According to the ambulance records of Mid-Missouri Ambulance Service, Plaintiff was transported away from the accident scene at or about 8:12 a.m., on September 16, 2002.

27. Plaintiff has no memory from after the time of the initial impact of the accident for a span of approximately forty (40) minutes, other than seeing emergency personnel and hearing them call for the Jaws of Life.

## PLAINTIFF'S MEDICAL TREATMENT

28. Plaintiff was transported to St. Mary's Health Center in Jefferson City, Missouri. She was brought into the emergency room at 9:18 a.m.

29. Plaintiff interacted with EMS emergency responders from the Mid-Missouri Ambulance District ("EMS personnel") and communicated to them that she did not have any injuries.

30. Plaintiff did not complain of any head injuries or unconsciousness to EMS personnel and EMS personnel reported "no obvious injuries" to Plaintiff.

31. Upon arriving at St. Mary's Hospital, Plaintiff was admitted to the emergency room. In the emergency room, Dr. John Zanol was the emergency room physician that made contact with Plaintiff. Plaintiff interacted with Dr. Zanol in the emergency room and told him what had happened to her in the accident.

32. Dr. Zanol asked the Plaintiff if she was injured, and he asked her specifically if she had hit her head, whether she had lost consciousness, and whether various body parts were hurt.

33. Plaintiff indicated to Dr. Zanol that she was not injured or hurt.

34. Dr. Zanol conducted a physical examination of Plaintiff. Plaintiff was covered in blood which was from her husband. There were no signs of injury to the Plaintiff's head, Plaintiff's neck was non-tender and there were no injuries to her chest or abdomen.

35. The hospital records reflect that a Glasgow Coma test was administered to the Plaintiff and she scored the highest score available, which is a fifteen (15) out of fifteen (15) on the scale. The Glasgow Coma scale is a way of scoring head injuries. The lowest score is a score of three (3), which is indicative of severe head injury, and the highest score is a score of fifteen (15), which is indicative of the lack of or very low likelihood of a head injury.

36. Plaintiff never told Dr. Zanol during his examination of her that she had been unconscious following the accident.

37. Plaintiff never indicated to Dr. Zanol during his examination of her that she had hit her head in any way.

38. Following Dr. Zanol's examination of Plaintiff, she remained in the emergency room department of St. Mary's Hospital for approximately two hours, after which Plaintiff was discharged from the hospital.

39. Plaintiff has never had any objective medical tests such as CAT scans, MRI scans, or similar tests, either on the date of or following the accident, that indicate she had any head injury following the accident.

40. Plaintiff has never received a medical diagnosis of any head injury related to the accident.

41. Plaintiff has never received a medical diagnosis of any back or neck injury related to the accident.

42. Plaintiff has never received a medical diagnosis of any injury related to the accident.

43. After the accident, Plaintiff experienced difficulty with her memory and ability to recall information. For example, she could not recall certain information about telecommunication systems that she knew prior to the accident; she could not recall and retrieve data from memory as she could before the accident; she experienced changes in her speech patterns, problems analyzing data, problems verbalizing her thoughts, and she could not remember the names of some people she knew before the accident.

44. Dr. Dale Halfaker performed neuropsychological testing on Plaintiff on July 21, 2003.

45. Based upon Dr. Halfaker's testing, he opined that Plaintiff had "mild neurocognitive dysfunction" in 2003 in the area of short term memory.

46. Dr. Halfaker was basing his opinion that Plaintiff suffered from a "mild neurocognitive dysfunction" as a result of the automobile accident in part on his belief that Plaintiff had sustained a head injury in the accident.

47. Dr. Halfaker agreed that he is not a medical doctor and that he is not qualified and cannot provide a medical opinion concerning whether Plaintiff suffered a head injury in the automobile accident of September 16, 2002.

48. Dr. Halfaker again tested Plaintiff in November 2009, and the results of that testing revealed that Plaintiff had moved from the area of a "mild neurocognitive dysfunction" into "normal limits."

49. Dr. Halfaker would have anticipated any mild neurocognitive dysfunction that Plaintiff had in 2003 to have resolved or cleared up within twelve (12) to twenty-four (24) months from the date of the accident.

50. Dr. Richard Dubinsky, M.D., Defendants' medical expert, testified that there is no medical evidence that Plaintiff sustained a traumatic brain injury in the accident. Dr. Dubinsky also testified that the results of Dr. Halfaker's neuropsychological testing do not indicate that Plaintiff suffered a traumatic brain injury in the accident.

## **PLAINTIFF'S CAREER AND WORK FOLLOWING THE ACCIDENT**

51. At the time of the accident, Plaintiff's career was in the telecommunications industry. Plaintiff had worked several years in the telecommunications industry as a specialist in telecommunications billing.

52. The last job that Plaintiff had before the accident was with Sprint in Kansas City, and that job ended in November of 2001. Plaintiff did not work between November 2001 and the date of the accident, September 16, 2002.

53. After the accident, Plaintiff went to work as an independent contractor through a company known as AMDOCS.

54. Plaintiff signed a "Service Agreement" with AMDOCS on April 29, 2003, to serve as an independent contractor for jobs that AMDOCS would arrange.

55. Plaintiff was not paid a salary as an independent contractor with AMDOCS, rather she was paid by the job and she was only paid when she worked.

56. Before the accident, Plaintiff had not worked with AMDOCS as an independent contractor at any time.

57. As an independent contractor with AMDOCS, Plaintiff did not work every week and when she worked was based entirely upon whether AMDOCS was able to secure a job for her.

58. AMDOCS did not provide any guarantees to Plaintiff concerning how many jobs it would be required to or able to provide for her and how often she would be working.

59. Since AMDOCS did not provide job guarantees, it could be weeks or even months between the times when Plaintiff would have a job to do and when she would therefore be paid for such jobs.

60. Following the execution of the Service Agreement between Plaintiff and AMDOCS, Plaintiff's first job through AMDOCS was a job in May of 2003, for Qwest Communications in San Antonio, Texas ("first job").

61. Plaintiff was part of a four-person team that went to San Antonio, Texas, to complete that job.

62. Plaintiff's contracted compensation for the first job only was a $20,000 flat fee and a $6,000 expense reimbursement for a six-week job.

63. The first job terminated at the end of three weeks in May 2003, and Plaintiff and the team from AMDOCS did not return to San Antonio for any more work on the first job.

64. Since the first job terminated half way through the six-week duration, Plaintiff's compensation was pro-rated for that job and she only received one-half of the contracted compensation amount, or $10,000 in flat fee and $3,000 in expense reimbursement.

65. Plaintiff's next job through AMDOCS was not for several months later, in November of 2003, in Rochester, New York, with Citizens Communications Company ("second job").

66. The second job in New York was also initially a six-week job in which Plaintiff's contracted compensation was also a $20,000 flat fee and $6,000 expense reimbursement for the six weeks.

67. Plaintiff was part of a team of four persons from AMDOCS who went to Rochester, New York, to work on the second job. The team completed the first six-week period of the second job and Plaintiff was compensated the full $26,000 for that six weeks.

68. At the end of the first six-week period of the second job, Plaintiff and her team made a presentation to Citizens Communications concerning their findings during that six-week period. As a result, they were awarded a second six-week contract at Citizens Communications to take place in January of 2004. Plaintiff's contracted compensation for that six-week period was again a $20,000 flat fee and a $6,000 expense reimbursement.

69. Plaintiff and her team completed the second six-week period at the second job in Rochester, New York, and made a presentation to Citizens Communications concerning their findings.

70. Plaintiff made the final presentation to Citizens and she felt that the presentation did not go well. In the end, Citizens did not award AMDOCS with a further contract to perform any more work for them.

71. Plaintiff was compensated by AMDOCS in the total amount of $26,000 in the year 2004, for the work on the second six-week period at Citizens Communications.

72. Andrew Darcy worked as the Chief Consultant on consulting projects with Plaintiff before and after the accident. His function was to direct and coordinate the work performed by other members of the consulting team, including Plaintiff. Darcy observed that, prior to the accident, Plaintiff was able to remember, organize, and discuss large amounts of specific data about a customer's telecommunications system without reference to notes or other documents or resource materials. She was also able to apply her knowledge about telecommunication systems to evaluate that data and speak persuasively to clients about the need for changes to their telecommunications billing system.

73. Darcy considered Plaintiff to be one of only five individuals who could perform the technical type of telecommunications consulting work that she did. He testified that she earned $1,000 per day in this function.

74. After the accident, Plaintiff worked with Andrew Darcy on the project with Qwest and the project with Citizens Communications. Darcy observed that Plaintiff was not able to recall detailed data and information; that she frequently had to refer to records or other reference sources to find data or information that was required to discuss a particular subject; and because of these factors, did not make persuasive

presentations to clients using specific data from the client's telecommunications system.

75. At the conclusion of the Citizens Communications project, Mr. Darcy informed Plaintiff that she had not performed the job adequately for the reasons previously described.

76. Andrew Darcy stated that, based on his work directly with Plaintiff after September 16, 2002, she was not capable at that time of performing the telecommunications consultant work that she performed prior to the accident. Darcy stated that Plaintiff could perform consulting work with lower requirements and reduced pay of approximately $400 per day.

77. Plaintiff has not earned any more income from her profession or working in any job since the compensation she received from the Citizens Communications job.

78. Since the Citizens Communications job, Plaintiff has not filed any job applications, Plaintiff has not submitted a resume at any potential employers, and has not sought employment other than to "wait" for someone to contact her.

79. Plaintiff has not seen any therapists or doctors to assist her in improving her memory functions since the end of the Citizens Communications job in 2004.

80. Plaintiff is currently not working or earning income from employment.

# CONCLUSIONS OF LAW

1. This action was originally filed by Plaintiff in the Circuit Court of Barry County, Missouri, but timely removed to this Court by Defendants.

2. This Court has original jurisdiction of this action under 28 U.S.C. § 1332, because complete diversity of citizenship exists between the parties, and because there is a sufficient amount in controversy.

3. Plaintiff waived a trial by jury in this matter.

4. This is an action for underinsured motorist insurance ("UIM") benefits against Defendants, and although the Plaintiff's claims are based upon the insurance contracts, the Defendants in essence "stand in the shoes" of the underinsured motorist and Plaintiff must prove that she is entitled to damages from the underinsured motorist. In this case, the alleged underinsured motorist is Jacob Gieschen.

5. Under Missouri law, Plaintiff must establish the following elements: (1) a legal duty on the part of Mr. Gieschen to conform to certain standards of conduct and protect others from unreasonable risks; (2) breach of that duty; (3) proximate cause between conduct and resulting injury; and (4) actual damages to Plaintiff's person or property. *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.,* 700 S.W.2d 426, 431 (Mo. banc 1985).

6. Since Plaintiff is seeking damages for bodily injury, Missouri law requires that Plaintiff show by substantial evidence that she was injured and that a causal connection exists between that injury and the accident. *Lidge v. Sears, Roebuck &*

*Co.,* 318 F. Supp. 2d 830, 836 (W.D. Mo. 2004)(citing *Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo. App. 1998)).

7. As to the existence of an injury, when the alleged injury is openly visible or within the realm of lay understanding, a Plaintiff may establish the existence of such an injury by lay testimony in Missouri. *Lidge,* 318 F. Supp. 2d at 836.

8. Conversely, when an alleged injury is a "sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, and particularly where there is serious question of pre-existing disability and its extent, the proof of causation is not within the realm of lay understanding." *Id.* (citations omitted).

9. Plaintiff's claim of a back injury resulting from the accident in this matter is not a visible injury or one which is within the realm of lay understanding, but is rather a sophisticated injury which requires either surgical intervention or other highly scientific technique for diagnosis. Further, there is some evidence that the Plaintiff's claimed back injury was preexisting. Since Plaintiff has offered no medical expert to render an expert opinion concerning either the existence or the cause of the alleged back injury, Plaintiff has failed to carry her burden of proof with respect to the existence of and causation for the alleged back injury.

10. Plaintiff's claim that she sustained a head injury is likewise a claim of a sophisticated injury. Plaintiff has proffered the opinion testimony of Dr. Dale Halfaker, Ph.D., a neuropsychologist, that Plaintiff suffered from mild neurocognitive dysfunction or injury following the accident. Dr. Halfaker is not a medical doctor and he cannot render a medical opinion concerning the existence of any head injury.

11. Dr. Halfaker performed a neuropsychological assessment of Plaintiff on July 21, 2003, approximately ten and one-half (10 ½) months after the accident upon referral by her attorney herein, Mr. Donald Cupps.

12. Dr. Halfaker performed a battery of psychological tests included in the Halstead-Reitan Neuropsychological Test Battery for Adults with supplementation of a number of companion tests and measures.

13. Based on his neuropsychological assessment, Dr. Halfaker concluded that Plaintiff sustained a mild neurocognitive disorder characterized by a decrease in cognitive efficiency that affects her attention, concentration, memory, and problem solving skills. In addition, Plaintiff has an adjustment disorder with mixed features of anxiety and depression. Dr. Halfaker attributed these conditions to the accident that occurred on September 16, 2002.

14. Dr. Halfaker opined that Plaintiff's brain dysfunction is permanent and attributable to a head trauma, rather than emotional distress resulting from the accident. The weight of the evidence does not support Dr. Halfaker's opinion.

15. Plaintiff has failed to carry her burden of proof with respect to the existence of the permanent brain injury alleged and causation as a result of head trauma suffered in the accident. Nonetheless, Dr. Halfaker's testimony together with the neurological tests he performed does establish that Plaintiff suffered a neurocognitive disorder as a result of the mental and emotional trauma occasioned by the accident. The evidence reflects this disorder resolved sometime after the second Citizens Communications job, which would have ended in February 2004, and prior to Dr.

Halfaker's second round of tests in November 2009. Dr. Halfaker further testified that, in his opinion, Plaintiff's neurocognitive dysfunction would have resolved, at the outside, within twenty-four (24) months of the date of the accident. September 16, 2004, was twenty-four (24) months after the date of the accident.

16. In order to recover damages, Plaintiff must establish that she suffered damages in excess of $100,000. The parties have stipulated that Defendants are entitled to a credit toward damages in the amount of the $100,000 paid to Plaintiff by Mr. Gieschen's insurer.

17. Plaintiff failed to establish that her medical expenses were reasonable, necessary, and causally related to the accident other than the charges of Dr. Halfaker in the amount of $1,445 for his diagnostic evaluation.

18. Plaintiff had a brief history of attempting to work as an independent contractor, however, this work was sporadic. Furthermore, Plaintiff did perform this work to the extent noted above in the two-year period after the accident. The evidence did establish that but for her injury, Plaintiff could have reasonably anticipated making $50,000 per year as an independent contractor. Plaintiff's injury minimally impacted her earning capacity for the period of two years following the accident, taking into account her obligation to mitigate her damages.

19. Plaintiff retained the capacity to work in the telecommunications field or at other jobs at a lesser rate of compensation, but made no effort to do so.

20. Mitigation of damages is a well-settled principle under Missouri law requiring a party injured by breach of a tort duty to make some reasonable effort to minimize the

damages after breach and injury have been inflicted. *Burrell v. O'Reilly Automotive, Inc.*, 175 S.W.3d 642, 651 n. 10 (Mo. App. 2005) (citing *Stipp v. Tsutomi Karawsawa*, 318 S.W.2d 172, 175 (Mo. 1958)).

21. Plaintiff has established injury that resolved prior to November 2009, but has failed to establish damages in excess of $100,000. Given Dr. Halfaker's testimony, the evidence reflects that Plaintiff's injury resolved within two years of the accident.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Judgment is hereby entered in favor of Defendants, Farmers Insurance Company, Inc. and Farmers Insurance Exchange, and against Plaintiff in that Plaintiff has failed to establish damages in excess of $100,000. Each party shall pay its own costs.

IT IS SO ORDERED.

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED: April 2, 2010